UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

UNITED STATES OF AMERICA,       :

       :

       :       11 Cr. 904 (RPP)

       - against -       :

       :

Drew K. Brownstein,       :

       Defendant.       :

       :

       :

       :

       :

       :

————————————————————— x


## SENTENCING MEMORANDUM OF DREW K. BROWNSTEIN

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...................................................................................................2

BACKGROUND........................................................................................................................4

I.  Procedural Background.....................................................................................................4

II. Personal Background .......................................................................................................4

    A. Family, Education and Career .....................................................................................5

    B. Character....................................................................................................................6

        1.  Work Ethic.........................................................................................................6

        2.  Relationship with Colleagues and Investors ........................................................9

        3.  Devotion to His Wife and Children ...................................................................11

        4.  Support for His Ailing Sister ............................................................................13

        5.  Kind Deeds for Friends.....................................................................................14

        6.  Charitable Works ..............................................................................................18

ANALYSIS OF § 3553(a) FACTORS.......................................................................................24

I.  A Sentence Below the Guidelines is Appropriate in this Case.................................................24

    A. Background to Offense Conduct...................................................................................24

    B. Both Mr. Brownstein's Personal History and Characteristics and the Nature
       and Circumstances of his Misconduct Warrant a Lenient Sentence...............................26

        1.  Mr. Brownstein's Exemplary Personal Life and Commitment to his Community
           Merit a Sentence Substantially Below the Advisory Guidelines Calculation........28

        2.  The Nature and Circumstances of the Offense Warrant a Reduced Sentence.......29

       C. The Advisory Guidelines Calculation in this Case Results in an Unduly Harsh
       Sentence Well in Excess of What is Necessary to Comply with the Sentencing
       Objectives of § 3553(a).............................................................................................32

       D. An Alternative, Non-Guidelines and Non-Incarceratory Sentence is "Just
       Punishment," Sufficiently Severe So as to Reflect the Seriousness of the
       Offense, to Promote Respect for the Law, and to Deter Future Wrongdoing ...............35

KL3 2856660.1

1.  Probation and a Rigorous Term of Community Service are Serious, Sufficient and
    Appropriate Punishment in this Case...................................................................35

2.  A Non-Guidelines Sentence Will be Sufficient to Provide Specific and General
    Deterrence...........................................................................................................37

3.  The Proposed Full-Time and Highly Structured Course of Community Service
    with National Jewish Health Will Amply Serve the Purposes of Sentencing and
    Will Provide Much Needed Benefits to the Institution..........................................38

KL3 2856650.1

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States,*
    552 U.S. 38 (2007)...............................................................................26, 28- 29, 35-36

*Kimbrough v. United States,*
    552 U.S. 85 (2007)...........................................................................................................32

*Koon v. United States,*
    518 U.S. 81 (1996)...........................................................................................................29

*Rita v. United States,*
    551 U.S. 338 (2007).........................................................................................................32

*United States v. Adelson,*
    441 F.Supp.2d 506 (S.D.N.Y. 2006)................................................................ 28, 33-34, 37

*United States v. Alatsas,*
    No. 06 CR 473 (JBW) (E.D.N.Y. Jan. 16, 2008)..............................................................29

*United States v. Booker,*
    543 U.S. 220 (2005).........................................................................................................24

*United States v. Emmenegger,*
    329 F.Supp.2d 416 (S.D.N.Y. 2004)................................................................................35

*United States v. Holzer,*
    09 Cr. 470 (S.D.N.Y. Sept. 29, 2009)..............................................................................31

*United States v. K,*
    160 F.Supp.2d 421 (E.D.N.Y. 2001) ...............................................................................36

*United States v. Okada,*
    07 Cr. 144 (S.D.N.Y. May 6, 2008)..................................................................................31

*United States v. Shamilzadeh,*
    No. 04-CR-194 (JG) (E.D.N.Y. Apr. 1, 2008)..................................................................29

*United States v. Yeaman,*
    248 F.3d 223 (3d Cir. 2001).............................................................................................37

## STATUTES

18 U.S.C. § 3553(a) ........................................................................................24, 26, 32, 36

U.S.S.G. § 2B1.4.................................................................................................33 n.9

U.S.S.G. § 3B1.3.................................................................................................31 n.6

U.S.S.G § 3E1.1.................................................................................................33 n.9

## MISCELLANEOUS

Herbert J. Hoelter, *Sentencing Alternatives - Back to the Future*, 22 Fed. Sent. R. 53
(Oct. 2008) .................................................................................................................29

Paul J. Hofer & Mark H. Allenbaugh, *Perspectives on the Federal Sentencing Guidelines
and Mandatory Sentencing*, 40 Am. Crim. L. Rev. 19 (2003) .................................................37

Drew K. Brownstein, by and through his undersigned counsel, respectfully submits this memorandum to assist the Court in determining an appropriate sentence following his plea of guilty to one count of insider trading. For the reasons set forth below, we respectfully submit that an appropriate sentence in this case would be a sentence of probation, including a lengthy period of home confinement and full-time community service (which could be greater than the 500 hours of community service recommended in the Presentence Report ("PSR")). As described in some detail below, and as set forth in the letter to the Court of Dr. Michael Salem, President and CEO of National Jewish Health ("NJH"), a venerable Denver academic hospital, we are proposing for the Court's consideration a rigorous, full-time program of service at NJH and its affiliated school for chronically ill children.[1]

This proposed sentence is in line with the recommendation of the PSR, which offers the following assessment of Mr. Brownstein and the appropriate sentence:

> While the offense is certainly serious and warrants punishment, overall, we do not believe that a lengthy term of imprisonment is required in this case to satisfy the interests of justice. We have considered the various factors outlined by defense counsel for a sentence outside the Guidelines range, along with our own personal evaluation of the defendant, and conversations with family, friends and co-workers. We note that Brownstein has expressed what appears to be genuine remorse for his conduct and it appears highly doubtful that he will become involved in future conduct of this nature. Additionally, we note that Brownstein has reportedly made arrangements to repay the full amount of the $130,000 in personal profit he gained from the offense, and has expressed willingness to pay any forfeiture imposed by the Court. As the Court may also be aware through submissions by defense counsel, it is evident that Brownstein has significant support from family, friends and members of the community, all of whom believe justice may be better served by a non-imprisonment sentence.

---

[1] Dr. Salem's letter and accompanying materials describing NJH are attached to this memorandum as Exhibit A.

1

PSR, at 19. The PSR recommends a sentence of six months imprisonment, followed by six

months of home confinement and 500 hours of community service, or, alternatively, a term of

either "intermittent confinement" or "community confinement." In other words, the Probation

Office concluded that a sentence substantially below the advisory Guidelines range, including

potentially one with no prison time but instead "community confinement," will serve the

purposes of sentencing in this case. We concur, and respectfully suggest that a sentence of a

significant period of home confinement and community service – for a period longer than the

500 hours recommended in the PSR – would equally well serve the goals of sentencing, and

would constitute meaningful punishment, while at the same time permitting Mr. Brownstein to

continue to participate in the raising and nurturing of his two-year old and three-month old

children.

## PRELIMINARY STATEMENT

Having pled guilty and accepted responsibility for his actions, Bo Brownstein

stands before this Court for sentencing.[2] As reflected in the numerous letters submitted on his

behalf, Mr. Brownstein is a young man of substantial achievement and good character, who

made an atrocious error in judgment – the illegality of which he has swiftly and unreservedly

acknowledged. Indeed, the letters – authored by a wide range of friends, family, business

colleagues and others who have come to know him – depict an unusual degree of commitment to

community and charitable involvement on the part of one so young. What Bo Brownstein is *not*,

we respectfully submit, is the type of insider trading defendant that this Court, and others in this

District, have all too commonly seen in recent years: an unscrupulous young hedge fund

---

[2]  Mr. Brownstein's given name is Drew, but he has long been known both in personal and
professional life as Bo.

KL3 2856660.1

manager who operated without regard for the rules. Nor, as the facts of this case make clear, was Mr. Brownstein engaged in an ongoing, calculated insider trading scheme, involving substantial planning, payments for information, or anything of the sort. Rather, and as we explain in some detail below, the misconduct here – again, without in any way disputing its illegality or seeking to excuse it – was aberrational.

The gains from Mr. Brownstein's trading were undeniably significant, approximately $2.4 million. Yet because the advisory Guidelines for insider trading are driven largely by this single fact, the amount of the gain, the resulting Guidelines range of 37-46 months speaks not at all to the actual facts of this case, the aberrational nature of the misconduct, or the otherwise exemplary character of this defendant.

Indeed, the Court has already recognized the appropriateness of a departure from the advisory Guidelines in this case, in sentencing Clayton Peterson, whose disclosure of the Apache acquisition of Mariner to his son Drew was the initial event in a series of tragic mistakes made by all three men. As this Court stated, in words which we respectfully submit are equally apposite here, "this case is different than the other cases . . . being currently prosecuted, because it doesn't involve scheming with other people to, in the trade to benefit by inside information." (Oct. 11, 2011 Sentencing Tr. at 21). Clayton Peterson's role in these events was of course different, but for Mr. Brownstein, no less than for Mr. Peterson, the illegal behavior here was aberrational and not the product of a plan or scheme. In this respect, it is nothing like the run of insider trading cases recently prosecuted in this District, which typically have involved elaborate and ongoing "rings" of defendants, many of whom made payoffs and destroyed evidence.

For all of these reasons, we respectfully submit that the Guidelines do not produce anything approaching a fair and just sentence in this case, and that due consideration of the 18 U.S.C. § 3553 factors supports imposition of a non-Guidelines sentence.

## BACKGROUND

### I.     Procedural Background

On October 21, 2011, pursuant to a plea agreement, Mr. Brownstein entered a plea of guilty to a one count Information charging him with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, Title 17 C.F.R. § 240.10b-5. The plea agreement contains a stipulated advisory Guidelines range of 37-46 months imprisonment; as noted, this range results from application of the loss table in section 2B1.1 to the gain resulting from trading in Mariner Energy securities on April 13 and 14, 2010. The plea agreement specifically provides that Mr. Brownstein may seek a non-Guidelines sentence pursuant to 18 U.S.C. § 3553(a).

### II.    Personal Background

Bo Brownstein is a first time offender who, as attested by the family, friends, colleagues, and investors who have submitted more than fifty letters on his behalf, has lived his life with integrity, compassion, and an intellectual engagement with the world evident since his early days growing up in Denver, Colorado. What emerges from these letters, which we have excerpted in part here but urge the Court to read in their entirety, is a picture of a young man with a strong work ethic, sense of honor and personal morality, deep love for his family, and commitment to the community.[3] Former U.S. Senator and current President of the United

---

[3]   Letters submitted in support of Mr. Brownstein are bound in a separate volume accompanying this memorandum. For the convenience of the Court, the letters are arranged alphabetically by the author's last name, within these categories: Family; Employees and Colleagues; Investors; Selected Letters Regarding Charitable and Civic Commitment; and Friends.

4

Nations Foundation Timothy Wirth, who has known Mr. Brownstein's family for forty years, and for whom Bo Brownstein worked as an intern, describes him as "mature and caring far beyond his years." With the obvious exception of the conduct that brings him before the Court – which he forthrightly acknowledges and in no way seeks to excuse – Mr. Brownstein has retained the strong values learned in his youth, conducted himself with decency towards people from all walks of life, and freely extended a helping hand to those in need or less fortunate than himself. Indeed, in light of the fact that he has necessarily spent much of his time with his wife and two young children and building the business he started three years ago, it is striking just how much he has worked to develop ongoing ways of giving back within the Denver community.

## A.    Family, Education and Career

Bo was born in Denver, Colorado on April 10, 1976, the son of Norman and Helen (known as "Sunny") Brownstein. He has an older brother, Chad, who lives in California, and a younger sister, Callae, who lives in New York City. As described by both friends and family members, Mr. Brownstein's family is exceptionally tight knit.

Mr. Brownstein attended Kent Denver High School, where he excelled both in the classroom and on the football field. Scott Yates, the then Associate Dean of Students and varsity football coach, explains in a letter, "[i]n the classroom, he was attentive, responsible, bright, hard working, and wouldn't allow himself to fall behind. He was one of those students who absorbed academics and enjoyed learning for learning's sake rather than for grades alone."

Mr. Brownstein's leadership and athletic achievement earned him a full scholarship to Northwestern University, where he was a member of the 1995 Rose Bowl Team. He later transferred to University of California Los Angeles, graduating in 1999 with a degree in political science. Mr. Brownstein then moved to New York City to join the real estate finance

5

group at Donaldson, Lufkin & Jenrette. After completing DLJ's analyst banking program, he entered Columbia Business School's eighteen-month accelerated degree program in January 2003 and graduated in April 2004.

While still in business school, Mr. Brownstein came to know the principals of Cambiar Investors, a well respected Denver-based investment firm, and began conducting research and sharing his investment ideas with them. In January 2004, he worked with Cambiar officials in the formation of Cuadrar Partnership, a hedge fund operating as part of the Cambiar group of funds. After his April 2004 graduation from Columbia, he returned to Colorado to join Cambiar and, as co-portfolio manager, take charge of building Cuadrar. Two years later, Mr. Brownstein became the youngest partner in Cambiar's history. In the fall of 2008, desiring more autonomy, he left Cambiar to start his own investment firm. Big 5 Asset Management began operations in January 2009, and soon grew to employ six people. The Lion Global Funds (a U.S. fund and, as is typical, a mirror image offshore fund), which were managed by Mr. Brownstein and concentrated in several industry sectors, including energy/oil and gas, were launched at the same time. The funds invested in companies with value characteristics and that were believed to be trading at a discount to both earnings and asset value.

### B.    Character

#### 1.    Work Ethic

Through hard work and determination, Mr. Brownstein's father, Norman, rose from humble beginnings to become a successful lawyer and philanthropist. Those qualities, along with service to one's community, are at the foundation of the core values that Norman and Sunny instilled in their children. Hard work was expected and independence was encouraged. As Mr. Brownstein's sister Callae explains, the children were "taught at an early age that great things are achieved with hard work and sacrifice." Most importantly, Mr. Brownstein's parents

6

taught their children that they had to pave their own way in life and not ride the coattails of their successful father. Norman and Sunny expected their children to make a path to success in their chosen fields on their own. No one took these values to heart more than their son Bo.

It is not surprising then, that in high school Bo Brownstein worked in heavy construction and as a busboy in a restaurant. From these early jobs, he learned the value of a dollar and the satisfaction of a hard day's work. Mr. Brownstein's wife, Lauren, is particularly proud of his work ethic and it was one of the reasons she fell in love with Bo: "I can't even count how many Friday nights he would have to work into the wee hours of the morning to complete a Saturday deadline or to get a jumpstart on the week ahead. Never had I met such a young, focused, dedicated, and diligent man."

People who knew the Brownstein family name or of Norman's successes may have assumed that his son would expect special treatment or an easy way in life, but Bo Brownstein proved them wrong. His high school football coach, Scott Yates, explains, "I figured that Bo would be hard to motivate and that he would be like some young people who have had life rather easy and would not be hungry, blessed with a work-ethic, or courageous. Fortunately, Bo proved my stereotype to be short-sighted and ignorant." When Mr. Brownstein started working with Carol Hutchings at Cambiar (she would later become Controller at Big 5), she did not know that his father was a successful Denver businessman. She believes "if it had been left to Bo, six years later I still wouldn't know who his dad was." Ms. Hutchings, who describes in her letter her own very modest upbringing and the value she places on hard work, explains that, "[f]rom my experience, what [Mr. Brownstein] has accomplished in his life has come through hard work. There was no silver platter. Nothing was ever guaranteed or handed to Bo. He simply worked hard." Similarly, Laura Bennett, Norman Brownstein's executive assistant for

7

more than ten years, has come to know the entire family well; she writes to the Court that the

Brownsteins "instilled [in their children] morals, hard work, manners, community service, and

most importantly respect and kindness to others." Eliot Penn, an analyst at Big 5 Asset

Management, notes:

> Bo has a voracious work ethic that all Big 5 employees were challenged to match. Early morning, late nights, weekends – he was always on. We'd joke that the only time we wouldn't hear from him would be when he was on an airplane.

> Mr. Brownstein worked even harder than before upon starting Big 5. As family

friend and investor Fred Smith writes to the Court:

> As you likely know, Bo's father has found success in the world of business. I have seen too many children of wealthy families act entitled and lazy as a matter of course. Bo took the exact opposite path. He worked the long hours that accompany investment banking. He worked hard through an accelerated business school curriculum at Columbia. He went above and beyond while working with Cambiar maintaining sector coverage while managing a separate portfolio of stocks for the firm's hedge fund.

Big 5 colleagues and investors recognized this superior work ethic from the very start. Ms.

Hutchings notes that Mr. Brownstein "kept longer hours than most of the other analysts and was

very focused on his job. He immersed himself in the sectors he was responsible for but seemed

to have an excellent grasp on the economy and market conditions as a whole. I observed people

seeking his opinion on issues many times and he always made time for those types of

conversations." And, she notes, he "works harder than everyone around him and doesn't feel

any job is beneath him. When we first worked together he stuffed all the investor monthly

statement envelopes. It wasn't until a few months later that I began to help him . . . . He just

didn't care what type of job it was; every job was important." Lion Global limited partner and

former Chief Executive Officer of First Data Corporation Charlie Fote agrees, noting that Bo

"wasn't anything like a number of hot shot money managers that I dealt with over time, instead,

8

he preferred to roll his sleeves up and do his own work. . . . He was respected by me as a hard working 'doer'."

Moreover, as former Senator Wirth describes in his letter to the Court, even as a very young man it was not just the fact that he worked hard, but the quality of Mr. Brownstein's hard work that was exceptional:

> I served in the United States Senate between 1987 and 1993, and Bo worked as a summer intern in my Washington office. His responsibilities included responses to constituent inquiries relating to their personal interactions with government. He worked closely with Colorado citizens who needed help with government agencies, particularly people with personal health care and insurance problems. This is difficult, often painful and moving work, dealing with what are often the most personal and desperate circumstances. To stay on the case demands real personal care and compassion for constituents who come from all walks of life. Bo was exceptionally good, showing his character, hard work, and real concern. I checked back with my Senate staff and they shared my enthusiasm: "very bright future"; "he'll do exceptional things"; "mature and caring far beyond his years."

## 2.    Relationship with Colleagues and Investors

Colleagues and investors have tremendous respect for Mr. Brownstein because of his work ethic, dedication to his job, and treatment of others. Big 5 employees know him as a supportive boss who takes pride in helping them grow to their fullest potential.

Garrhett Melendrez recounts that as a low-level employee in the shipping department at Cambiar, Mr. Brownstein's simple acts of kindness gave him a "deeper perspective of the value and benefits of hard work [which] really impacted and motivated me. I could tangibly see the benefits of hard work and it affected me greatly, motivating me to succeed." And he witnessed similar behavior toward employees at Big 5:

> I also recall that when Big 5 Asset Management was still in its initial phase, how Bo as the CEO would take time from his day to not only encourage his employees, but mentor them as well as he built the company from the ground up. In contrast to these

9

generous actions, someone who was only out to make a profit
would not have invested in the personal growth and well-being of
their employees as individuals.

Mr. Melendez writes to the Court that his experience with Mr. Brownstein was important in

motivating him to return to school to earn a college degree.

A former intern at Cambiar, Jordan Pollak, describes how Mr. Brownstein

"invested his time in me in order to allow me to get the full and proper experience that he

believed I deserved." In fact, "[o]n a day-to-day basis Bo would dedicate a decent portion of his

day to truly make sure that I was digesting and putting forth the information I was taught." At

the end of the summer, Mr. Brownstein gave Mr. Pollak a check out of his personal checking

account as a thank you for all his hard work during the otherwise unpaid internship.

Mr. Brownstein's Big 5 colleagues continue to support him. Larry Raiman, a

member of Big 5's investment team, describes how Mr. Brownstein sent Big 5 employees a

"heartfelt" email at 1:28 a.m. the night after he pleaded guilty. Mr. Raiman thought it was

"incredibly thoughtful and magnanimous" for him to have sent "such a generous email and to be

thinking of others after such a difficult experience, shouts loudly about Bo Brownstein's

character." Both Mr. Raiman and Ms. Hutchings describe how Mr. Brownstein's first reaction

after receiving a subpoena was "to protect the investors." Mr. Raiman recounts that Mr.

Brownstein "took every action to place his investors and employees before himself." Ms.

Hutchings elaborates, explaining that Mr. Brownstein liquidated all of the Fund's securities

positions, thereby foregoing potential future profits in which he would have shared:

> [Mr. Brownstein] quickly made the decision to liquidate all
> investments. Bo's main goal in doing this was to protect investors
> in two ways. First, by selling off the portfolio in a quiet and
> methodical manner he could be assured of receiving the best sales
> price in the market. Considering the multiple millions in assets
> and the position size of some of the holdings, selling off in a quiet
> manner was key. Secondly, by putting all of the assets into cash

10

> Bo eliminated a potentially devastating scenario in which the
> prime broker (holder of the assets) could have shut down our
> ability to settle trades and convert the assets to cash. With the
> portfolio in 100% cash he solidified our ability to distribute the
> cash back to the investors in a timely fashion.

Moreover, notwithstanding his misconduct and its effect on the Fund, a number of Big 5 investors continue to trust Mr. Brownstein. Julia Peay writes, "[t]here is no one in the world I trust with my money more than Bo." Scott Reiman, who was Big 5's first investor and committed a significant amount of money to the fund, writes that he "never once was worried about our investment" and that Mr. Brownstein "puts his investors' interest ahead of his own as evidenced by the fact that he took the Lion Global portfolio to cash immediately after learning of an impending investigation of the firm." Indeed, Mr. Reiman states that he "would trust [Mr. Brownstein] again to be the custodian of mine and my family's money." Fred Smith, who invested $2 million in Lion Global fund, writes, "[l]ooking back, I have absolutely no regrets regarding investing with Bo. Moreover, if Bo came to me, I would not hesitate to invest with him or partner with him in the future."

### 3.    Devotion to His Wife and Children

Mr. Brownstein is devoted to his wife Lauren and their two children, two-year old Brody and three-month old Presley. Lauren writes that "Bo is a wonderful, loving, and devoted father who adores his children" and describes him as "my best friend, my soul mate, the love of my life." Their Rabbi writes to share his observations about their relationship:

> I have felt a palpable understanding, devotion and support for his
> wife. I have seen how they gracefully and lovingly tend to one
> another and in turn enhance each other's soul and spirit. When he
> became a parent, I observed how the manner in which Lauren and
> he supported one another deepened and flourished. I observed,
> too, how . . . fully he embraced and nurtured his children with his
> gentle and loving spirit.

11

Mr. Brownstein is a hands-on father who takes immense pride in the development and well-being of his children. In just two years, Mr. Brownstein and his son Brody have formed such a close bond that Brody looks up to his father as his "hero." Since the September 2011 birth of Presley, Brody and his father have grown even closer as Bo has had to assume some of Lauren's role in parenting Brody while she is busy nursing and caring for a newborn. In her letter, Lauren describes her husband's and son's daily rituals together. When Brody wakes up each morning, he calls for his father and Mr. Brownstein reads him stories while Lauren nurses Presley. They also listen to music and sing songs together. Mr. Brownstein helps Brody brush his teeth, get dressed and then takes him to nursery school. To keep Brody engaged and entertained during the week, Mr. Brownstein will take Brody on activities, such as swim class, the park, or the zoo. Brody and Mr. Brownstein share a love of wild animals and "[a]t the zoo, they roar at the lions and tigers, growl at the bears, tweet like the birds, and stare in awe at the giraffes." During trips to the park, Mr. Brownstein will call his wife to proudly report on new activities of their little "daredevil." Mr. Brownstein encourages Brody to have confidence as he takes on new challenges and activities and, as Lauren recounts, to overcome his fears. Last year, Brody severely burned his hand the stove.

> Brody was in pain and terrified, but having both of us there, as a team, reassured him that he was going to be all right. Bo gave him the courage and the comfort to know that everything was going to be okay. For two weeks, twice a day, as I held Brody gently, Bo tenderly changed his bandages. We were able to treat him at home rather than having to go to the doctor's office, because the two of us worked together as a team and were able to do Brody's dressings ourselves.

Mr. Brownstein and his three month old daughter Presley have already started bonding. Each night Mr. Brownstein and Lauren switch responsibilities so that Lauren can spend time alone with Brody as he prepares for sleep and Mr. Brownstein can bond with Presley.

KL3 2856660.1

Lauren explains that "Bo helps keep Presley awake for me in the evenings, so by the time I nurse

her and put her to sleep, she is able to sleep a long stretch of hours, so I can get some rest." This

is yet another example of how Mr. Brownstein and Lauren work as a team when raising their

children.

Numerous other letters to the Court similarly describe Mr. Brownstein's love for

his wife and children, and its importance in his life.

### 4. Support for His Ailing Sister

On October 10, 2010, the Brownstein family learned the devastating news that

Callae, until then a healthy 32-year old woman, had primary central nervous system lymphoma,

a rare form of cancer in which malignant cells form in the lymph tissue of the brain. For the next

six months, Callae received extensive treatment at Sloan Kettering Hospital in New York City,

which included 40 days in isolation after receiving a high dose of chemotherapy. As Norman

and Sunny Brownstein write to the Court, in facing this terrifying medical crisis, their son Bo

was the "glue" that held the family together and "inspired all of us to believe in a successful

outcome even in the very darkest of days." Lauren's brother, Dr. Steven Davidoff, describes Mr.

Brownstein as Callae's "rock and champion."

Mr. Brownstein provided invaluable support to his sister as she underwent

treatment to fight this aggressive form of cancer. He spent many hours on the phone with

Dr. Davidoff, an emergency room physician, so as to better understand the pathophysiology of

Callae's cancer and, in turn, "provide her and his family with the best emotional and physical

support." He flew weekly from Colorado to New York City to be by his sister's side, despite the

fact that he had a new business and pregnant wife at home. Callae recounts that her brother

"never complained about all the things he was juggling, he simply focused on cheering me up,

13

making me laugh through the horrendous pain of chemotherapy and eventual[ ] stem cell transplant."

Callae describes how her brother made sure she remained positive and upbeat despite the tremendous stress, both mental and physical, that she was undergoing. He read spiritual essays by Deepak Chopra so he could "help [Callae's] wounded spirits and assist [her] to continue with a positive outlook." He also "always balanced [their] discussions so that [Callae] wouldn't be overwhelmed and made sure that it ended with a good laugh." Following a dose of concentrated chemotherapy – from which many do not survive – when Callae was required to live isolated in a "dreary small room" for nearly 40 days, Mr. Brownstein was so worried about the risk of infection and "the condition of my small space that he went to the store and purchased yellow rubber gloves and disinfectant so that he could personally clean my room." A year later, Callae's health has significantly improved, and, as she writes the Court, "[e]very interaction I have with my brother keeps me on the path of recovery."

### 5.    Kind Deeds for Friends

Mr. Brownstein never misses an opportunity to lend a hand to a friend in need, whether it is helping an unemployed acquaintance find a job or providing much needed support after the death of a loved one. Those who know Mr. Brownstein know that they have a friend whose support is unwavering and deep. A number of them have written to the Court to support Mr. Brownstein during this difficult time in his life, just as he was there for them.

Mr. Brownstein was a friend to Matt Geniesse at a time when Mr. Geniesse had alienated friends and family and "had no money, no job, no car and no real hope." Mr. Geniesse, who was going through a bitter divorce and custody battle, explains in his letter that "[t]his was the roughest point in my life and I was terrified as I had no idea what I was going to do." Mr.

14

Brownstein learned about Mr. Geniesse's dire situation from a mutual friend, and immediately reached out to offer help, even though they had not spoken in years. At Mr. Brownstein's urging, Mr. Geniesse was hired by the father of Sarah Peay, another letter writer. Ms. Peay explains that Mr. Brownstein asked her father to "take a chance" on Mr. Geniesse and that her father did so because he trusted Mr. Brownstein. She explains that "Bo put his reputation on the line for someone he had known since high school, even though he was not a close friend."

Mr. Geniesse describes the impact Mr. Brownstein had in helping him turn his life around:

> After interviewing, I was hired for a job that provided a salary and benefits that would allow me to provide for my children. I cannot even begin to put into words the relief I felt when I found employment. The importance of my getting a job cannot be understated. At the time, I had absolutely nothing, which not only impacted my life, but the lives of my children. This is devastating to a father. Bo's help literally changed my life.

* * *

> At the end of the conversation, Bo said that he would meet me outside of my building in 15 minutes. I had no idea why. Bo arrived to give me $2,000 to enable me to care for my children until I received my first pay check. There were no strings attached. He knew that I was not in the position to pay him back anytime soon and may not be able to ever repay him, but he did not make me feel like I owed him anything for taking his money. He never made me feel bad about myself for needing the money. Bo did this because that is the type of person he is. It is in his heart. He helps those in need however he can. I did not let him see this, but as soon as he left, I was brought to tears because of his kindness and generosity and the relief I felt now that my life was getting back on track.

Perhaps most importantly, Bo Brownstein was there for Mr. Geniesse "when so many others had turned their backs" on him. Mr. Geniesse explains, "Bo was the only person in my life, THE ONLY PERSON, who cared enough about me to help. He listened to me,

15

supported me and provided true friendship. Bo is truly one of the most selfless people I have ever met and he is the type of friend who will be there for you in both the good times and bad."

Mr. Brownstein showed similar generosity, both in his actions and in financial assistance, to his high school football coach, Scott Yates. Mr. Yates was in a dispute concerning land he had purchased for his retirement. When Mr. Brownstein learned of the situation, he located a lawyer who was willing to provide representation to Mr. Yates in part without charge. At the time, Mr. Yates was unaware that his legal bills "far exceeded the 'pro bono' budget" that was negotiated. Only later did it "c[o]me to my attention that Bo contributed financially to this cause . . . . The invoice I paid was considerably less than what I thought it was going to be. He did this simply out of the respect and gratitude he has for me and was dismayed to hear that I learned of his gesture." This is typical of Mr. Brownstein.

Jon Embree, the current head coach of University of Colorado football team, tells of Mr. Brownstein's advocacy on his behalf as he sought to become the first African-American to hold that position. Mr. Embree describes how Mr. Brownstein helped him achieve his "lifelong dream." Mr. Brownstein was "an early advocate of my appointment by persuading the ultimate decision-makers that I should receive strong consideration for the position." He arranged informal interviews and dinners with key University of Colorado supporters to help Mr. Embree "cement [his] status as a lead candidate when the formal interview process started." Mr. Brownstein's advocacy continued throughout the process, up to the point that Mr. Embree was given the head coaching position. Despite not being a University of Colorado alumnus, Mr. Brownstein spent a significant amount of time lobbying for Mr. Embree's appointment. He did so not for any personal benefit, but both because he was passionate about Mr. Embree's abilities

16

and because he thought it important that a talented and qualified minority candidate not be
overlooked by the selection committee.

For other friends, Mr. Brownstein has given the gift of support, strength and
encouragement during times of crisis. His friend Sarah Peay and her mother Julia describe how
Mr. Brownstein dropped everything in his life to be by their side when Sarah's brother died in a
car accident. Julia Peay explains:

> I owe my life to Bo. My only son was killed the summer before
> his senior year of high school. I thought my world had come to an
> end. . . .
>
> Bo was in California when this happened and flew back
> immediately. I couldn't eat or sleep. Bo came over everyday to
> make sure I ate at least one meal. He spent hours with my
> daughter and me helping us work through this horrible ordeal.
>
> Bo became my surrogate son and my daughter Sarah's surrogate
> brother. Many people say they will be there for you but as time
> passes they forget. Not Bo. He continues to this day to always be
> there for us.
>
> My husband was so grief stricken he was unable to function. It
> was Bo that helped me make the funeral arrangements, select a
> casket, and hold my hand as I viewed my son's body. Bo was my
> rock.
>
> At one point early on, I was suicidal and Bo sensed it. He spent
> the whole day with me and convinced me that one day Sarah
> would be able to make sense of her brother's death but would
> never forgive me for leaving her. It is because of Bo I am alive
> today.

Sarah, a teenager when her brother died, writes about how Mr. Brownstein
provided her a shoulder to cry on:

> Bo would be the one person I could rely on throughout the years.
> He was there, more than any other friend. Over the next few
> weeks, he came over as much as possible to check in on me, play
> games, watch movies and just be there to get my mind off of my
> loss as well as discuss everything that happened.

17

Mr. Brownstein was the only person with whom Sarah could talk about her brother's death, as her parents "were experiencing their own grief and [her] other friends did not know what to say/not say, but Bo made time to support [Sarah] in [her] grieving and to help [her] get back on track."

These are just a few of the many stories in the submitted letters detailing the numerous ways Mr. Brownstein has touched the lives of others. As Jordan Pollack writes, when Mr. Brownstein tells others that he will help them, those are not empty words. "I have always known that I could reach out to Bo for advice or support whenever needed because he is the type of person who is always there for others no matter what."

### 6.   Charitable Works

As noted, giving back to the community is a core value Mr. Brownstein got from his parents, and one he took seriously as early as high school, when he volunteered for Meals on Wheels, bringing food and support to elderly adults on his lunch break. Since that time, Mr. Brownstein has made community service and philanthropy an integral part of his life. Importantly, he did so well before the commencement of the government's investigation in this case.

For the past three seasons, Mr. Brownstein has served as an assistant football coach at Kent Denver High School. As described by head football coach Scott Yates, a few years ago Mr. Brownstein simply started "showing up to our practices and volunteering his time to help our linemen to mature." He spent "countless hours" helping two adopted African players, who had no football background, and "to their credit and to Bo's they are thriving. . . . They truly would have never made it off of the bench if it were not for Bo's care and tutelage." As wife Lauren notes: "He attends every game, banquet, and award ceremony that he can make, to show his support for the boys. Brody and I have taken such pleasure in watching Bo coach

and have joined him on the sidelines of games, watching him in action, coaching, cheering, and mentoring these high school boys." Big 5 colleague Eliot Penn explains, "[d]espite a packed schedule and extreme demands at work and home, Bo volunteered as a coach at a local high school and would disappear for hours in the middle of the day—in stark contrast to his 'always on' work ethic. He told me that it was a challenge to make time for it, but he relished the opportunity to give back."

Mr. Brownstein also volunteers for The Cope Branch of The Boys and Girls Club of America in Denver. He coaches football to eleven to thirteen year old boys and girls and is a soccer coach to a team of girls. He also volunteers in the computer lab, where he works with the students and reviews their homework.

In addition to these direct volunteer efforts, Mr. Brownstein, upon his return to Denver from New York in 2004, sought to implement a systematic pattern of community good works by himself and other young professionals. To that end, he approached Richard Robinson, a leading businessman and philanthropist in the Denver community, asking how Mr. Robinson's generation "had established such a cohesive and successful network of private charitable work in the community." As Mr. Robinson explains in his letter to the Court, after he had provided the requested advice, Mr. Brownstein wasted no time implementing it, "found[ing] a nonprofit group of young professionals who collaboratively discussed the charitable needs of the community and volunteered their time and contributions to many worthwhile organizations."

Aaron Hyatt, contemporary of Mr. Brownstein, describes the formation of this group of Denver's young professionals:

> Bo believed that if we could come together as a group, we would
> not only magnify the impact of our giving, but, perhaps more
> importantly, we would encourage our peers to do more. This
> message resonated with our group, and with me personally. So,

19

> with Bo at the helm, we formed a nonprofit corporation – a "giving circle" – dedicated to supporting worthwhile nonprofits in our community.

> Bo insisted, however, that our giving circle do more than just write checks. Instead, Bo challenged us to survey our community to find deserving organizations and to then get involved in a meaningful way. Our giving circle would then have regular meetings to discuss our proposed beneficiaries and to determine, as a group, how we could make a meaningful impact. In our first year, our group made charitable contributions in excess of $40,000.00 to nonprofit organizations in our community. . . . More importantly, through Bo's leadership and inspiration, each member of our giving circle became more active and more involved in our community.

Also upon his return to Denver, and in the same vein, Mr. Brownstein approached Yana Vishnitsky, the President and CEO of Jewish Family Service of Colorado ("JFS"). As Ms. Vishnitsky writes to the Court, Mr. Brownstein, having "spearheaded the creation of a young business leaders group" (described above), "wanted to find the best ways to impact the community through JFS programs." As result of that overture, Mr. Brownstein and the other young professionals focused on what became known as the Jewish Disabilities Network. The Network provides recreational activities for special needs children and adults. As Ms. Vishnitsky writes, Mr. Brownstein has remained committed and involved, through fundraising and organizing.

Those who have seen Bo's commitment to charitable organizations regard him as a real leader who has much to offer the Denver community. Mr. Robinson writes, "We need younger leaders to carry on these traditions and Bo Brownstein is one of those leaders." Former United States Senator Hank Brown has written to the Court on behalf of Mr. Brownstein, describing him as "a 'can't miss' young man with ambition, talent and genuine caring involvement with people in our community regardless of their social and economic station." Senator Brown believes that "he will still do many positive things in his life."

20

Also upon the founding of Big 5 Asset Management, Mr. Brownstein decided that

corporate giving would be a fundamental part of his new company. Big 5 annually contributed

tens of thousands of dollars to the causes supported by its employees. Bo also encouraged

employees to take paid time off for volunteer opportunities. Carol Hutchings explains:

> Bo encouraged all of us at Big 5 to get involved and give back to
> our community. Many events those of us at Big 5 participated in
> either received a monetary contribution if asked or time off from
> work. For example, Bo gave me the day off so I could participate
> in an event where volunteers helped clean up and do building
> maintenance on a 100 year old firehouse that housed a women's
> non-profit. Bo was also careful not to disturb me on my one
> Saturday a month that I work for Volunteers of America to deliver
> food to senior citizens. Another employee not only received a
> donation from Big 5 but two days off from work to participate in a
> fund raising bike ride in New York. Bo fostered an environment
> that allowed all of us to give back.

And as Eliot Penn writes to the Court:

> One evening early on in Big 5, Bo dropped by my office and said
> that our firm was about giving back and no matter what I was
> already involved with I should find one additional cause that I'd
> like to support, and get involved. He told me that I could take time
> off from work to volunteer and that he'd be eager to provide
> financial support as well. It wasn't just me – he encouraged
> everyone at the firm to do the same. In one memo of some
> guidelines he wrote, "Participate in charitable endeavors, ask for
> nothing in return."

Importantly, Mr. Brownstein lives by this creed, as his charitable activities are

selfless and without the expectation of recognition in return. Brian Greenspun, a family friend

and the President and Editor of the *Las Vegas Sun*, writes that Mr. Brownstein's "concern for

others has always taken priority over that for himself." Many do not know the extent of his

philanthropy, which includes donations of time and/or his own money to the Children's Hospital,

Allied Jewish Federation, The Beacon Center for Abused Women and Children, and Jewish

Family Services, among many others. Others observed Mr. Brownstein's quiet donations, never

KL3 2856660.1

wanting or expecting any acknowledgment in return. Big 5 colleague Larry Raiman writes, "I personally witnessed several instances where Bo committed significant amounts of time and money toward charitable causes, never asking for recognition, and always looking to make an impact." Jon Embree, head football coach at the University of Colorado, writes about Mr. Brownstein's support for Mr. Embree's organization Buffs 4 Life and how Bo agreed to purchase a sponsorship being sold to raise money for the organization while foregoing the associated acknowledgment. Mr. Embree explains, "Bo's support stemmed from his desire to make a difference and help those in need. He had no interest in receiving recognition for his efforts. This is just part of Bo's character; he would give you the shirt off of his back and ask for nothing in return."

Professional football player and close friend Brandon Stokley describes a similar experience regarding Bo's contribution to a scholarship fund founded in honor of Mr. Stokley's late father. Mr. Stokley was most impressed by the manner in which Bo made the donation:

> A few days later we were with some friends and Bo walked up to me very discretely and put something in my pocket. I didn't pay any attention to it until later when I opened the envelope and saw what it was. I remember saying to myself that's a great guy. Most people would of made sure everybody saw what he was doing, but Bo didn't. He wasn't making the donation to get noticed or to receive anything in return. Rather, he made the donation because he wanted to support the scholarship fund and be a good friend to me. That's just how he is.

All the while juggling a new business and a young family, Mr. Brownstein made a conscious, concerted and successful effort to incorporate community service into his daily life, and he took the further step of encouraging his friends, colleagues and peers to get involved and to give back in their own ways.

\* \* \*

22

In sum, we respectfully submit that Bo Brownstein is a person of good character, as exemplified by his conduct outside the facts of this case and as expressed by those who know him well. As Charlie Fote, an investor in the Lion Global Fund and a leading businessman in Denver, writes:

> [Bo] is a loving husband, father and son, and I know that he has been an extremely active member in the community through his volunteering and charitable efforts. . . . If any young man was worth taking a shot on to redeem himself I would say without hesitation that Bo Brownstein will exceed even the highest of standards set by the court.

23

## ANALYSIS OF § 3553(a) FACTORS

### I.    A Sentence Below the Guidelines is Appropriate in this Case

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. §
3553(a), district courts are required to impose a sentence that is "sufficient, but not greater than
necessary" to accomplish the traditional goals of sentencing set forth in the statute. We
respectfully submit that analysis of the section 3553(a) factors establishes that a non-Guidelines
sentence is appropriate in this case.

### A.    Background to Offense Conduct

As noted, Mr. Brownstein began working for Cambiar Investors in 2003, while
also taking a full schedule of classes at Columbia, thereafter joining Cambiar to participate in the
formation of its Cuadrar investment fund. He was given an unusually high degree of
responsibility virtually from the outset, and within just two years was made the youngest partner
in the firm's history.

A decision made by Mr. Brownstein in September 2008, during the market
turmoil surrounding the collapse of Lehman Brothers, is illustrative of the manner in which he
handled his duties as co-portfolio manager of the fund. Believing that the market was both
difficult to understand and unpredictable, and thus too risky, he decided to convert the entire
Cuadrar portfolio to cash. This was a decision taken wholly in the interests of Mr. Brownstein's
investors – and potentially damaging to his own, because hedge fund investors may well be
displeased by having their investments in cash, earning little or no return, and because
redemptions can be made easily. Liquidating all of Cuadrar's securities positions thus risked
both jeopardizing the relationships Mr. Brownstein had worked so hard to build, and the
possibility that investors would pull out of the Fund. Nevertheless, given the state of the
economy at the time, Mr. Brownstein, despite the potential negative reactions from his investors

24

and the detrimental effect on his own bottom line, concluded he should sell all of the fund's holdings, a decision that proved to be the right one when the market crashed.

In January 2009, Mr. Brownstein formed Big 5 Asset Management and the Lion Global investment funds. At Big 5, he continued to develop specialized expertise in the energy sector. Mr. Brownstein's investment strategy was not focused on one specific geographic area or any single investment thesis. Rather, he developed an approach that focused on companies with out of favor or undervalued assets, including oil and gas reserves in the Gulf of Mexico. This investment strategy ultimately led Mr. Brownstein to focus on a number of energy companies, including Mariner Energy.

As Mr. Brownstein's investment conviction in a particular company reached the point that he was prepared, upon the occurrence of a "triggering" event relating to that company, to make the investment, he would add its name to Big 5's "watch list." Mariner Energy was placed on the watch list in January 2010. By that time, Mr. Brownstein was long familiar with Mariner, as he had made a significant purchase of Mariner stock and options for the Cuadra fund in 2008 and had monitored the company's operations and progress throughout 2009.

In early April 2010, Mr. Brownstein made plans to attend the Oil & Gas Investment Symposium sponsored by the Independent Petroleum Association of America in New York, beginning on Monday, April 12. Representatives of Mariner Energy, among other companies Big 5 was following, were scheduled to make a presentation regarding the company. Mr. Brownstein flew to New York on Sunday evening, April 11.

On the evening of Monday, April 12, Drew Peterson informed Mr. Brownstein that he had learned from his father Clayton that Mariner Energy was going to be acquired. The two men had a discussion on Tuesday morning, April 13, in which Drew Peterson repeated that

Mariner was about to be acquired by another company. Mr. Brownstein purchased Mariner securities on April 13 and 14, for the Lion Global funds, as well as in his own IRA account and in certain accounts over which he had trading discretion.[4]

Mr. Brownstein's transactions for the Lion Global funds were neither unusual nor unusually large. His investment approach generally dictated that when he decided to go forward with the trade, he did so in transactions of substantial size, purchasing both common stock and options. Thus, for example, in April 2011, Mr. Brownstein caused the Lion Global Funds to invest in a company called Petrohawk, an oil and gas investment similar to Mariner Energy. The Lion Global investment in Petrohawk consisted of large scale purchases of both common stock (152,000 shares for $3,899,693.80) and options (1,486 contracts for $367,606.97).[5]

On April 15, following public disclosure of the Mariner-Apache merger, Mr. Brownstein liquidated the positions in the Lion Global Funds, as well as in his personal IRA account. With respect to the trades made on April 13 and 14, the funds and Mr. Brownstein's IRA made profits of $2,020,633.46 and $130,671.68, respectively. The positions in discretionary accounts made profits of $305,050.

### B. Both Mr. Brownstein's Personal History and Characteristics and the Nature and Circumstances of his Misconduct Warrant a Lenient Sentence

As the Supreme Court has described it, section 3553(a)(1) is "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007). This first statutory factor

---

[4]   There is no contention that these account holders had any knowledge that Mr. Brownstein's trading in their accounts was based on material nonpublic information.

[5]   There is no allegation that the trading in Petrohawk was premised on material nonpublic information.

KL3 2856660.1

reflects – as the Guidelines do not – the critical component of any sensible sentencing regime that the district judge "make an individualized assessment based on the facts presented." *Id.*

We respectfully submit that both Mr. Brownstein's personal history and characteristics and the nature and circumstances of his insider trading in Mariner Energy securities warrant a lenient, non-Guidelines sentence:

- Notwithstanding his young age, Mr. Brownstein has already established a broad and serious record of community and charitable involvement.

- Friends, business colleagues, Big 5 employees, and eminent Denver citizens who know him well and have mentored him – all, uniformly, describe him as a caring, committed, ethical person.

- He has a close and loving relationship with his wife and two young children, as well as his parents and siblings.

- Mr. Brownstein promptly took responsibility for his conduct.

- He is – and again, this is consistently noted by those who know him well – deeply remorseful for his crime and the harm he caused. As his wife writes in her letter to the Court, "Bo wakes up everyday of his life with regret and the deepest remorse for his actions, which have hurt everyone around him."

- The crime was manifestly different from the type of insider trading case this Court is all too familiar with, in ways that, we respectfully submit, call for a lenient, non-Guidelines sentence:

  - It was not the product of lengthy planning or scheming, but was instead the product of a single tip.

  - There was no "ring" of insider traders and tippers, and no pattern of insider trading. Instead, there was trading in the securities of one company, over two days.

  - Mr. Brownstein had a longstanding interest in Mariner Energy securities, based on legitimate research and analysis and hard work. In addition, the size of the position, while large, was entirely consistent with Mr. Brownstein's investment strategy and trading history. When he decided to invest on behalf of the Lion Global funds, he typically purchased common stock and options in significant dollar amounts.

KL3 2856560.1

**1.    Mr. Brownstein's Exemplary Personal Life and Commitment to his Community Merit a Sentence Substantially Below the Advisory Guidelines Calculation**

As described at length above by the many family, friends, and colleagues who have submitted letters on his behalf, Mr. Brownstein is an honorable, hard working and decent young man, who has, apart from the conduct to which he has pleaded guilty, led an exemplary life. He is a loving father and husband, and a caring friend to those in need. He has been a productive member of his community, giving of his time, enthusiasm, and resources. The Court will sense from his wife Lauren's letter how much she has come to rely upon her husband, who, is the "love of [her] life," "soul mate," and "best friend." So, too, Mr. Brownstein has an exceptionally close relationship with his children, both of whom would be profoundly affected should their father be imprisoned during their formative years. Mr. Brownstein's charitable acts and kindness towards others, moreover, have come without thought of public recognition or acclaim, as reflected in the letters described above. As Judge Rakoff noted in *United States v. Adelson*, this bears on the assessment of both the man before the Court, as well as the appropriate sentence. 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) ("[The defendant's] good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of sentencing.") (citation omitted).

Following *Booker* and *Gall*, courts have imposed non-Guidelines sentences, including noncustodial sentences accompanied by probation, where, as in this case, the defendant's conduct is starkly at odds with his life and character. Indeed, the Supreme Court, in *Gall*, affirmed a non-incarceratory sentence of three years' probation rather than the suggested Guidelines range of 30 to 37 months imprisonment for a drug conspiracy based upon, among other § 3553(a) factors, the defendant's positive "post-offense conduct, . . . the support of family and friends, lack of criminal history, and his age at the time of the offense conduct." 552 U.S. at

43-44 (internal citation omitted). Similarly, in a recent fraud case involving a loss of more than

$150 million, Judge Gleeson imposed a sentence of probation, home confinement, and

community service. In so doing, he was influenced by the defendant's cooperation with the

government. But he also specifically commented on the value of alternatives to incarceration

based on the defendant's circumstances:

> [N]othing should ever be out of bounds and I've struggled with
> your lawyer's request, struggled with it throughout the
> presentations I've heard here, and I conclude that a sentence that
> doesn't include incarceration is appropriate here. Alternatives to
> incarceration exist that can carry both the community and this
> Court's condemnation of your conduct but channel it in a way
> that's more constructive . . . . The combination of circumstances in
> your case makes you worthy of serving your punishment in a
> manner that's a little more constructive than going to jail.

*United States v. Shamilzadeh*, No. 04-CR-194 (JG) (E.D.N.Y. Apr. 1, 2008), *reported in* Herbert

J. Hoelter, *Sentencing Alternatives – Back to the Future*, 22 Fed. Sent. R. 53, 56 (Oct. 2009)

(attached hereto as Exhibit B); *see also, e.g.*, *United States v. Alatsas*, No. 06 CR 473 (JBW),

2008 WL 238559, at *2 (E.D.N.Y. Jan. 16, 2008) (in loan fraud case where loss amount resulted

in 14 level increase and thus a sentencing range of 24 to 30 months imprisonment, Judge

Weinstein imposed sentence of three years' probation and full restitution because, among other

reasons, defendant "has a good relationship with his wife and three children, and is an ethical

entrepreneur").

### 2.    The Nature and Circumstances of the Offense Warrant a Reduced Sentence

Just as the Court is to "consider every convicted person as an individual," so, too,

must the Court evaluate "every case as a unique study in the human failings that sometimes

mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52

(*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)). There is no doubt that Mr.

29

Brownstein's conduct was wrongful. He has acknowledged it was wrongful and accepts full responsibility for his actions. Yet without in any way seeking to excuse or justify what Mr. Brownstein did, we respectfully submit that when viewed in full and in context, the specific facts of this case warrant a sentence well below the Guidelines.

This is not a case in which the defendant set out to engage in insider trading. There was no "ring", no plan or pattern of misconduct, no payments for information, no obstruction of justice or other follow-on misconduct of the sort. The disclosure of inside information came from a lifelong friend, with whom Mr. Brownstein was regularly in contact, and whose father – fatally for all concerned – was a longtime director of the target company, and who elected to tip his son to the merger transaction. The crime took place over just two days.

Again, this was unambiguously unlawful, but in light of the aberrational nature of Mr. Brownstein's misconduct, we respectfully submit that a non-incarceratory sentence, supplemented by a term of community service, is a sentence that fulfills the statutory mandate: sufficient, but not greater than necessary. Indeed, this Court has already recognized the appropriateness of a probationary sentence in the context of this case. Clayton Peterson pled guilty to a two count Information, charging both conspiracy and securities fraud, in connection with his conduct in this case, *i.e.*, disclosing the Apache merger transaction to his son Drew, in breach of his fiduciary duty as a director of Mariner Energy, resulting in trading by Drew Peterson on the basis of that material nonpublic information. This Court sentenced him to 2 years' probation and 3 months' house arrest – which was less than the 12-18 month incarceratory sentencing range contemplated by the guidelines.

Your Honor thus recognized that in the context of Mr. Peterson's aberrational conduct, a non-guidelines, non-incarceratory sentence was appropriate. For the reasons set forth

KL3 2856660.1

above, we respectfully submit that the same assessment applies to Mr. Brownstein. Indeed the only significant difference between the advisory Guidelines ranges of Mr. Peterson and Mr. Brownstein is a direct result of the dollar amount of the gains attributed to them – a factor that is largely out of the defendant's hands, as we discuss in Point I(C) below.[6]

Other courts, too, have recognized the appropriateness of sentences consisting of a combination of probation, community service, and in some cases home confinement, in lieu of imprisonment, in circumstances akin to Mr. Brownstein's.

Thus, for example, in *United States v. Okada*, 07 Cr. 144 (S.D.N.Y. 2008), the defendant, a 32 year old Bear Stearns trader, pled guilty to one count of conspiracy to commit insider trading and one count of insider trading. Unlike Mr. Brownstein, Mr. Okada participated in two separate and sustained insider trading schemes. Facing an applicable sentencing range of 30-37 months, he was sentenced by Judge Chin to three years' probation, and one year of home confinement. The Court found that a non-Guidelines probationary sentence was warranted based on the fact that Okada was not the person who had misappropriated the material nonpublic information, he had accepted responsibility, and he was embarking on a new path in life with the support of his family and friends.[7]

Similarly, in *United States v. Holzer*, 09 Cr. 470 (S.D.N.Y. 2009), the defendant pled guilty to one count of conspiracy and one count of insider trading. Mr. Holzer was an attorney and, as Judge Marrero described it, had "committed these acts while a member of the

---

[6]   Clayton Peterson's misconduct, in at least one respect, may be regarded as more serious that Mr. Brownstein's. Mr. Peterson's Guidelines calculation included a two-level enhancement because he "abused a position of public or private trust in a manner that significantly facilitated the commission of the offense." (U.S.S.G. § 3B1.3). Mr. Brownstein's agreed upon Guidelines do not include any such enhancement.

[7]   May 6, 2008 Sentencing Tr. (attached hereto as Exhibit C), at 25.

31

state bar and working as a tax attorney."[8]  The stipulated Guidelines range was 12-18 months.

Yet Judge Marrero, agreeing with the Probation Office's characterization of Mr. Holzer as a

"good person who made a terrible mistake," sentenced him to 5 years' probation, including nine

months in a halfway house.  The Court cited Mr. Holzer's "commendable community service

and his pro bono work with various not-for profit organizations" and his lack of criminal history

as reasons for rejecting the advisory Guidelines sentence.

### C.    The Advisory Guidelines Calculation in this Case Results in an Unduly Harsh  Sentence Well in Excess of What is Necessary to Comply with the Sentencing Objectives of § 3553(a)

This Court has broad authority to reject the advisory Guidelines sentencing range.

Indeed, the Supreme Court has indicated that the sentencing court should consider the possibility

that a Guidelines sentence is not just *unnecessary* to accomplish the goals set forth in § 3553(a),

but that such a sentence would be "greater than necessary" – put differently, that a Guidelines

sentence will actually thwart application of § 3553(a)'s command to impose the minimum

sentence necessary to achieve the goals of sentencing.  *Rita v. United States*, 551 U.S. 338, 351

(2007).  Based on its evaluation of all of the § 3553(a) factors, the court may reach that

conclusion, and elect to impose a sentence substantially deviating from the advisory Guidelines

range, "based solely on policy considerations, including disagreements with the Guidelines."

*Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

We respectfully submit that this is such a case.  The Guidelines calculation yields

an unjust result, well beyond the minimum necessary sentence, for two independent, and related,

reasons:  It fails utterly to account for the actual facts of the case (*i.e.*, it does not even begin to

---

[8]  Sept. 29, 2009 Sentencing Tr. (attached hereto as Exhibit D), at 17.

KL3 2856660.1

reflect the individual offender or individual offense, as we describe above), and it is based virtually entirely on the dollar amount of the trading.

As the Court is aware, in insider trading cases, the critical component of the Guidelines calculations is the financial "gain," based upon the fraud loss table in § 2B1.1. Here, the applicable Guidelines offense level is 21 – with fully 16 levels attributable to the dollar amount of the trading gain – yielding a sentencing range of 37-46 months.[9] Courts have recognized that the "inordinate emphasis" placed on the dollar amount of the economic loss in financial fraud cases can result in unreasonably high sentencing ranges. *E.g., United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). As with the crack/powder cocaine weight-based scheme discussed in *Kimbrough*, making the insider trading Guidelines substantially dependent on the single sentencing enhancement of economic gain virtually invariably yields harsh results, to the detriment of proportionality and to the exclusion of the other statutory goals of sentencing. *See Kimbrough*, 552 U.S. at 109-10.

The use of the fraud loss table in § 2B1.1 as a proxy for gain in insider trading cases yields even more irrational and disproportionate results than in fraud cases with an identifiable victim who suffered a quantifiable loss. In an insider trading case, whatever one may conclude regarding the harm to the owner of the material nonpublic information or to the markets caused by insider trading generally, using the dollar amount of the proceeds of the trading is arbitrary. Here, for example, it disproportionately penalizes Mr. Brownstein, even

---

[9]   As set forth in the plea agreement, the base offense level in this case is 8. (U.S.S.G. § 2B1.4(a)). Because the gain resulting from the offense was more than $1,000,000 but less than $2,500,000, 16 levels are added, using the loss table at § 2B1.1(b)(1)(I), as directed by § 2B1.4(b). Because Mr. Brownstein accepted responsibility and gave early and timely notice of his intention to plead guilty, he receives a reduction of 3 levels. (U.S.S.G § 3E1.1(a) and (b)). The resulting offense level of 21 equates to 37-46 months imprisonment.

33

though his insider trading was both aberrational and in dollar terms consistent with his practice. At the same time, in the case of Clayton Peterson – who, as the Court noted, also made a serious, aberrational error in judgment, by disclosing material nonpublic information learned as a director of a public company – use of the loss table had little impact, simply because the trades done by his son were relatively small.

Moreover, the amount of the gain used in the Guidelines calculation is *all* of the proceeds of the illegal trading, which means that it can substantially exceed the defendant's actual gain – as it does in this case, where most of the proceeds went to investors and not to Mr. Brownstein personally.[10] Nor do the Guidelines take account of the fact that the trading by Mr. Brownstein in Lion Global, in this size, was typical, rather than an out of the ordinary, outsized investment.

These infirmities have been cited as warranting imposition of a non-Guidelines sentence. In *Adelson*, for example, Judge Rakoff, citing Second Circuit Judge Cabranes, stated: "As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of the drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." 441 F. Supp. 2d at 509 (citing Judge Cabranes, in *Fear of Judging: Sentencing Guidelines in the Federal Courts*, at 69 (1998) (concluding that the Sentencing Commission has never presented empirical evidence or substantial argument to support the proposition that its rules achieve, even imperfectly, any of the four well-established possible objectives of criminal sentencing)). As

---

[10]   We acknowledge, of course, that Mr. Brownstein benefitted as well from the successful trading in the Funds' accounts.

KL3 2856660.1

Judge Lynch has also observed, blind application of the "overly rigid" loss table may result in over-punishment, because this economic component can often be a "weak indicator of the moral seriousness of the offense and the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). The amount of gain associated with insider trading is "a kind of accident" dependent upon a number of factors out of the defendant's control. *Id.* For this reason as well, the advisory Guidelines sentencing range in this case effectively ignores the requirement of individualized sentencing and disserves the sentencing goals set forth in § 3553(a).[11]

**D. An Alternative, Non-Guidelines and Non-Incarceratory Sentence is "Just Punishment," Sufficiently Severe So as to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Deter Future Wrongdoing**

We respectfully submit that the proposed noncustodial sentence, with a period of home confinement and conditioned upon a full-time and rigorous program of community service, will vindicate all the goals of sentencing codified at § 3553(a)(2) – that is, imposition of a sentence reflecting the seriousness of the crime, promoting respect for the law, imposing "just punishment," and providing for both specific and general deterrence. *Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007).

**1. Probation and a Rigorous Term of Community Service are Serious, Sufficient and Appropriate Punishment in this Case**

"The Sentencing Reform Act provides sentencing judges with flexibility to consider which of the core sentencing principles – retribution, deterrence, incapacitation, and

---

[11]  Were it not for the Guidelines' use of the loss table – effectively to the exclusion of all other § 3553(a) factors – Mr. Brownstein's advisory offense level would be 5, resulting in an advisory sentence of 0-6 months, rather than 37-46 months. Perhaps the Guidelines could provide for some other, more nuanced and reasonable way to factor in the specifics of the actual trading, but as currently written they do not, yielding an arbitrary and "greater than necessary" sentencing range.

35

rehabilitation – are most important in a particular case, and to provide alternatives to incarceration where necessary in carrying out statutory goals." *United States v. K*, 160 F. Supp. 2d 421, 431 (E.D.N.Y. 2001) (citing 18 U.S.C. § 3553(a)(3)). A felony conviction upon a plea of guilty, coupled with a sentence of probation, home confinement, and rigorous and meaningful community service, together constitute a substantial punishment in these circumstances, while avoiding the interruption of Mr. Brownstein's support of his family. A community service component to a non-Guidelines sentence would also be consistent with Mr. Brownstein's history of helping those in need.[12]

Both the U.S. Probation Office and the Supreme Court have stressed that probation is in fact *punishment*. As described by the Probation Office, community service "addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation"; it "adds a punitive measure to probation . . . [and] restricts offenders' personal liberty." Office of Prob. & Pretrial Servs., Admin. Office of the U.S. Courts, *Community Service* (2006) (attached to this Memorandum as Exhibit F). "Community service is a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair – a 'win-win' proposition for everyone involved." *Id.*

And as Justice Stevens wrote in *Gall*:

> We recognize that custodial sentences are qualitatively more
> severe than probationary sentences of equivalent terms. Offenders
> on probation are nonetheless subject to several standard conditions
> that substantially restrict their liberty. Probationers may not leave

---

[12] In addition to permitting Mr. Brownstein to continue his direct support of his family, home confinement, as the Probation Office has observed, "helps mitigate the skyrocketing costs associated with a prison system bursting at the seams," and promotes the sentencing goals of punishment, and specific and general deterrence. *See Home Confinement Saves Money, Provides Benefit*, Press Release, U.S. Courts, The Federal Judiciary, available at http://host4.uscourts.gov/Press_Releases/homecon.html (Exhibit E hereto).

36

> the judicial district, move, or change jobs without notifying, and in
> some cases receiving permission from their probation officer or the
> court. They must report regularly to their probation office, permit
> unannounced visits to their homes, refrain from associating with
> any person convicted of a felony, and refrain from excessive
> drinking.

552 U.S. at 48.

### 2.     A Non-Guidelines Sentence Will be Sufficient to Provide Specific and General Deterrence

Specific deterrence has already been achieved. Following his criminal conviction,

Mr. Brownstein has closed the Lion Global Funds, he is no longer in the securities business, is

facing SEC sanctions, and his reputation has been devastated. *See Adelson*, 441 F. Supp. 2d at

514 ("his reputation [having been] ruined by his conviction, it was extremely unlikely that

[Adelson] would ever involve himself in future misconduct"). With respect to general

deterrence, there is considerable evidence that even relatively short sentences can have a strong

deterrent effect on prospective white-collar offenders. *See, e.g., id.* at 514; *United States v.

Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting, in part) ("It is widely

recognized that the duration of incarceration provides little or no general deterrence for white

collar crimes. . . . [T]here is not a scintilla of evidence here that longer sentences will deter

anyone from committing mail and wire fraud."); Paul J. Hofer & Mark H. Allenbaugh,

*Perspectives on the Federal Sentencing Guidelines and Mandatory Sentencing*, 40 Am. Crim. L.

Rev. 19, 64, n. 192 (2003) ("A deterrence researcher advising the Commission prior to the 2001

amendments concluded that the available data suggest that the certainty of punishment is more

important to deterrence than is severity.") (citation omitted).

### 3.   The Proposed Full-Time and Highly Structured Course of Community Service with National Jewish Health Will Amply Serve the Purposes of Sentencing and Will Provide Much Needed Benefits to the Institution

Mr. Brownstein's demonstrated commitment to civic and charitable causes, his status as a first-time offender, and the specific facts of this case all make him a strong candidate for a sentence of community service rather than incarceration. A long-term requirement of full-time, structured community service would be just punishment, and it would provide badly needed assistance to a venerable Denver hospital and the chronically ill and underprivileged children it serves.

National Jewish Health is a 112 year old, world renowned academic medical center in Denver. As described in detail in the attached letter to the Court from its President and CEO, Dr. Michael Salem (Exh. A), NJH is a charity hospital providing entirely free specialty medical care, as well conducting research and operating a K-8 school for chronically ill children. NJH recently learned of Mr. Brownstein's upcoming sentencing and has offered to supervise him in a program of community service. Dr. Salem has met with Mr. Brownstein on several occasions and they have discussed at length NJH's staffing needs and the skills and experience Mr. Brownstein can provide. In his letter to the Court, Mr. Salem details the proposal for Mr. Brownstein's placement at NJH, including working at the hospital's K-8 grade school for chronically ill children on campus. Mr. Brownstein's responsibilities would include providing the children with daily physical education classes that are critical in helping them gain life skills and confidence; developing an academic course for the school's oldest children; coordinating the Gastrointestinal Eosinophillic Disease Program, which provides care to pediatric patients suffering from the disease; assisting families in financial need navigate the various social and welfare programs available to them; and other activities that support both patients and parents.

38

Significantly in these difficult economic times when resources are scarce, NJH would gain a full-time staff member for an extended period of time who has excellent credentials, a proven commitment to community service, and a track record of hard work.

KL3 2856660.1

## CONCLUSION

For the foregoing reasons, we respectfully submit that all of the goals set forth in 18 U.S.C. § 3553(a) can and will be fulfilled by a non-Guidelines sentence of probation, including a period of home confinement and conditioned upon a full-time program of community service.

Dated:  December 13, 2011

Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP

By: /s/ Gary P. Naftalis
    Gary P. Naftalis (GN-5489)
    David S. Frankel (DF-6815)
    1177 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 715-9100
    Fax: (212) 715-8000

    Attorneys for Drew K. Brownstein

40